IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MARYLAND


WILLIAM A. TACCINO            *
                              *
v.                            *
                              *   Civil Action No. WMN-09-2703
CITY OF CUMBERLAND, MARYLAND  *
                              *
    *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

                           **MEMORANDUM**

    Before the Court are motions to dismiss filed by Defendants Mayor and City Council of Cumberland[1] (the City) and Lee Fiedler, the Mayor of Cumberland (Mayor Fiedler), Paper No. 9, and by Defendants Jan Alderton, the Cumberland Times-News (the Times-News), and Community Newspaper Holdings, Inc. (CNHI), Paper No. 12. The motions are fully briefed. After the completion of the briefing on Defendants' motions, Plaintiff filed a motion to dismiss the claims against all Defendants except those against Mayor Fiedler. Paper No. 26. The Court will grant Plaintiff's motion, rendering the motions of all Defendants save Mayor Fiedler essentially moot. Upon a review of the pleadings related to the claims against Mayor Fiedler and the applicable case law, the Court determines that no hearing is necessary,

---

[1] Plaintiff identifies this party as "City of Cumberland, Maryland." The proper name as set forth in the city charter is "Mayor and City Council of Cumberland."

Local Rule 106.5, and that those claims should be dismissed as well.

**I. FACTUAL BACKGROUND**

This action arises out of an October 17, 2006, public meeting held in Cumberland's City Hall and presided over by Defendant Fiedler. Plaintiff attended the meeting, went to the podium, and spoke to an issue related to insurance coverage for City-owned vehicles driven by off-duty City employees. Plaintiff's concern was prompted by a then-recent DUI charge involving an off-duty City employee. Compl. ¶ 16. Plaintiff became involved in a conversation with the City Attorney about the issue while at the podium and Mayor Fiedler interrupted that conversation and asked Plaintiff to "please be quiet. Please sit down." Id. ¶ 20. According to the Complaint, the City Attorney made a reference to the DUI charge at which point Mayor Fiedler cautioned Plaintiff that he was getting into a personal or personnel matter. Id. ¶¶ 21, 22. After Plaintiff answered Fiedler that "It is not personal, Sir," Fiedler instructed Cumberland City Police Officer Brian Lepley to remove Plaintiff from the hearing room. Id. ¶ 23. Lepley, using what Plaintiff describes as "excessive force, grabb[ing] Plaintiff by his left arm," escorted Plaintiff out of the hearing room.[2]

---

[2] Although Plaintiff mentions Lepley in his narrative and later avers that Mayor Fiedler "conspired with the police department

2

As Plaintiff left the hearing room, he noticed three other City police officers in the City Hall building. Plaintiff exited the building and was told by the officers that if he went back inside, he would be arrested. Plaintiff then went to the police station to file a complaint and then proceeded to the hospital to get treatment for his left arm. The physician that treated Plaintiff stated that the x-ray revealed that the arm was bruised. Id. ¶ 33.

Plaintiff, proceeding pro se, filed the Complaint in this Court on October 16, 2009. The Complaint purports to contain ten counts but it is more in the nature of a five count complaint with five causes of action paired with five corresponding prayers for damages. Count I/II asserts against the City and Mayor Fiedler violations of Plaintiff's constitutional rights, specifically his right to free speech. Although Plaintiff does not identify it as such, the Court assumes Plaintiff is bringing the claim under 42 U.S.C. § 1983. Count III/IV asserts against Mayor Fiedler a claim of "Conspiracy Against Rights (For Political Gain), Abuse of Authority, Misuse of Police Department." Plaintiff states that he is bringing this claim pursuant to 18 U.S.C. § 241. See id. ¶ 6. Part of the foundation for this claim is Plaintiff's

---

(Cpl Brian Lepley)," Compl. ¶ 48, Lepley is not named as a defendant.

belief that the police officers he observed at City Hall were needed elsewhere to respond to various accidents and crimes. This same belief concerning the appropriate deployment of the police force forms the foundation for Count V/VI, "Malfeasance, Incompetency While in Office," also against Mayor Fiedler. Under this count, Plaintiff seeks Mayor Fiedler's resignation from his position as Mayor. In addition to the resignation of Mayor Fiedler, Plaintiff seeks $400,000.00 in punitive damages and $150.00 in compensatory damages, presumably for expenses related to his visit to the hospital to have his arm examined.[3]

Turning first to those claims asserted against Mayor Fiedler in Count III/IV and V/VI, the Court concludes that they are simply not claims sustainable in this Court. The "Conspiracy Against Rights" claim in Count III/IV is brought pursuant to a <u>criminal</u> statute, 18 U.S.C. § 241. While criminal penalties may arise under this statute, there is no authority given for private citizens to bring a civil suit for damages under this provision. <u>See</u> <u>Willing v. Lake Orion Community Schs.</u>, 924 F. Supp. 815, 818 (E.D. Mich. 1996). Similarly, a claim of malfeasance in office, Count V/VI, is a criminal violation, not subject to civil enforcement. Certainly the

---

[3] The Complaint contained two additional counts, Count VII/VIII and Count IX/X, brought against Defendant Times-News and Defendant Alderton. As noted above, Plaintiff has voluntarily dismissed his claims against those Defendants.

4

relief requested with this claim, the forced resignation of an elected official, is not within this Court's power to grant.

In moving to dismiss the § 1983 claim asserted against Mayor Fiedler in Count I/II, Defendants cite to a decision from the Fourth Circuit that arose in a factual situation remarkably similar to that presented here, Collinson v. Gott, 895 F.2d 994 (4th Cir. 1990). Collinson arose out of a public meeting called by the Calvert County Board of Commissioners to discuss a reorganization plan. Defendant Gott, the President of the Board, presided over the meeting and announced that anyone wishing to speak would have two minutes but must confine their remarks to the reorganization issue and not discuss "personalities." As the plaintiff began to speak, Gott deemed his initial remark as being off of the topic at hand and called him out of order. As the plaintiff continued to speak, a police officer, following Gott's direction, approached the plaintiff and told him he had to leave. The plaintiff peacefully complied and left the hearing room.

After Collinson brought a § 1983 claim against Gott in this Court, Gott moved for summary judgment on the ground the he was entitled to qualified immunity. This Court denied the motion and Gott appealed. A divided three member panel of the Fourth Circuit reversed this Court's decision, finding that Gott was entitled to summary judgment on the § 1983 claim. Judge

5

Phillips concluded that the appropriate question for the court was whether Gott was entitled to qualified immunity under the test for that form of immunity set out in Harlow v. Fitzgerald, 457 U.S. 800 (1982). Judge Phillips then answered that question in the affirmative. Judge Butzner agreed that the issue before the court was Gott's entitlement to qualified immunity but he concluded that there was a genuine dispute of material fact on that issue such that Gott was not entitled to summary judgment. The third judge on the panel, Judge Wilkinson, citing the "litigious ordeal that inheres in a determination of the appropriateness of qualified immunity," 895 F.2d at 1005, concluded that local government officials presiding over public meetings should be entitled to absolute immunity. Because two judges concluded that Gott was entitled to immunity, albeit for different reasons, the denial of Gott's summary judgment motion was reversed.

While this Court finds Judge Wilkinson's concurring opinion instructive as it highlights the potential harm to local government and public debate brought by exposing those who preside over public hearings to civil liability for isolated incidents of poor judgment, the Court ultimately agrees with the conclusion of Judges Phillips and Butzner that claims such as Collinson's and Plaintiff's are properly resolved under a qualified immunity framework. As Judge Wilkinson acknowledged,

6

"the Supreme Court has been 'quite sparing' in its grants of absolute immunity to public officials." Id. at 1010 (quoting Forrester v. White, 484 U.S. 219, 224 (1988)).

Because Judge Phillips' concurring opinion in Collinson addresses qualified immunity in a context so similar to that presented here, this Court will quote that opinion at some length.

> [T]he now-familiar test of qualified immunity is whether government officials [ ] in performing discretionary functions have engaged in conduct that violates "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Obviously, under that test, an official may be entitled to immunity from suit even where he has violated a plaintiff's rights - if they were not then "clearly established" or if a "reasonable person" in the official's position could have failed to appreciate that his conduct would violate them. See Mitchell v. Forsyth, 472 U.S. 511, 535 (1985) ("decisive fact is not that [defendant's] position turned out to be incorrect, but that the question was open at the time he acted").
>
> In analyzing a claim of qualified immunity it is therefore necessary first to identify the specific constitutional right allegedly violated, then to inquire whether at the time of the alleged violation it was clearly established, then further to inquire whether a reasonable person in the official's position would have known that his conduct would violate that right. The first two of these inquiries present pure questions of law for the courts, see Anderson v. Creighton, 483 U.S. 635 (1987); Mitchell, 472 U.S. at 535 n. 12. The third, which involves application of Harlow's objective test, may sometimes require factual determinations respecting a defendant's conduct and its circumstances, but the test's ultimate application is also a matter of law for the court. See Anderson, 483 U.S. at 646 n. 6.

7

> In the first step, determining whether the right allegedly violated was "clearly established," the proper focus for courts is not upon the right at its most general or abstract level, but upon its application to the particular conduct being challenged. Anderson, 483 U.S. at 639; see also Tarantino v. Baker, 825 F.2d 772, 774-75 (4th Cir. 1987). Furthermore, the assessment whether a "reasonable person" in the official's position would have known that his conduct would violate "clearly established" rights must be made on the basis of information actually possessed at the time by the official, Anderson, 483 U.S. at 641, or then readily available to him, Sevigny v. Dicksey, 846 F.2d 953, 957 n. 5 (4th Cir. 1988), and in light of the exigencies of time and circumstance in which the official took the action challenged. See Malley v. Briggs, 475 U.S. 335, 350 (1986) (Powell, J., concurring in part and dissenting in part). The tolerance thus accorded by the objective test to "good faith" mistakes of judgment traceable to unsettled law, or faulty information, or contextual exigencies, is deliberately designed to give protection "to all but the plainly incompetent or those who knowingly violate the law," Malley, 475 U.S. at 341, in order to avoid undue inhibition of public officials in the discharge of their discretionary duties. Anderson, 483 U.S. at 638.

Collinson, 895 F.2d at 998.

The constitutional right allegedly violated in Collinson, like the right allegedly violated here, was the right to freedom of speech under the first amendment. This right, as Judge Phillips noted, is not unqualified.

> [T]his general right is of course subject to the qualification that government officials may impose reasonable time, place, and manner restrictions upon speech in public forums, so long as they are content-neutral and are "narrowly tailored" to serve a significant governmental interest. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 295, (1984); Heffron v. International Society for Krishna

8

> Consciousness, Inc., 452 U.S. 640, 647-48 (1981). It
> is subject to the further qualification that even
> content-based restrictions may be imposed where there
> is "a clear and present danger that [the speech] will
> bring about the substantive evils that [government]
> has a right to prevent," Schenck v. United States, 249
> U.S. 47, 52 (1919), though the evil justifying such a
> restriction must "rise[] far above public
> inconvenience, annoyance, or unrest." Terminiello v.
> Chicago, 337 U.S. 1, 4 (1949). And finally, the
> general right may be subjected to greater restrictions
> in "limited" public forums specially created by the
> state than in such traditional "open" public forums as
> streets, parks, and general meeting halls. See City
> of Madison Joint School Dist. No. 8 v. Wisconsin
> Employment Relations Comm'n, 429 U.S. 167, 175 n. 8
> (1976) (called public meetings); id. at 180 (Stewart,
> J., concurring).

Collinson, 895 F.2d at 999.

In analyzing whether a reasonable person in Gott's position would have known that he was violating this clearly established right as so qualified, Judge Phillips opined,

> It is hard to imagine circumstances in which the
> tolerance commanded by immunity doctrine for possible
> mistakes of judgment by public officials is more
> appropriate and necessary than those confronted by
> officials presiding over potentially explosive public
> hearings. Typically untrained and inexperienced in
> the difficult business of presiding and applying rules
> of order in fast-moving situations of tense political
> controversy, such officials are particularly fit
> subjects for the protections afforded by qualified
> immunity doctrine. Someone, after all, has to perform
> these necessary functions. The policies that underlie
> immunity doctrine will not be served by holding such
> persons to too exacting standards of calm and
> prescience in avoiding unintended violations of their
> fellow citizens' speech rights in this context. When
> the undisputed facts of this meeting's tense context
> and the specific exigencies of the moment are taken
> into account, it is obvious that at the very least
> persons of reasonable competence in Gott's position

9

could have disagreed over whether the ability to
conduct an orderly meeting was sufficiently threatened
by Collinson's opening remarks to justify cutting him
off immediately.

It may well be that Gott's perception both of
basic need and of appropriate means was flawed. It may
well be that Gott's chosen means were more draconian
than justified by the actual exigencies. It is thus
possible that Collinson's constitutional right was
violated. But that . . . is not the question, and on
the question that is before us, I would find Gott
entitled to immunity.

Collinson, 895 F.2d at 1004.[4]

The Court concludes that the same result must be reached here. According to the Complaint, Plaintiff was initially given the opportunity to speak to the issue of his concern. Only when he continued to have a sidebar conversation at the podium with the City Attorney after being asked to be quiet did Mayor Fiedler instruct the police officer to remove Plaintiff from the hearing room. The Complaint also indicates that Mayor Fiedler only acted after the conversation turned to what Mayor Fiedler believed was a specific personnel (or personal) matter. Although he may have been mistaken in that belief, nothing in the Complaint would support the conclusion that, if a mistake, it was not a good faith mistake. Under the exigencies of the situation as understood by Mayor Feidler, he certainly could

---

[4] See also, Osborne v. Lohr-Robinette, Civ. No. 05-106, 2006 WL 3761597 (S.D. W. Va. Dec. 20, 2006) (following Collinson and concluding that a mayor who ejected plaintiff from town council meeting was entitled to qualified immunity).

10

conclude that having Plaintiff removed from the meeting was a reasonable time, place, and manner restriction upon speech in this public forum.

In reaching this conclusion, the Court is cognizant that, unlike the trial court's ruling in Collinson, this decision is rendered on a motion to dismiss, not on a motion for summary judgment.  While at this stage in the proceedings the Court must accept as true all well-pled allegations in the complaint and must construe the facts and reasonable inferences from those facts in the light most favorable to the plaintiff, Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997), the complaint must still contain sufficient factual matter to state a claim to relief that is "plausible on its face" in order to survive a Rule 12(b)(6) motion to dismiss.  Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009).  This, the Complaint does not do.  In dismissing the Complaint at this stage, the Court is mindful of the admonition in Collinson that "[v]indication of immunity policies depends heavily upon the ability to dispose of insubstantial claims by resolving immunity questions at the earliest possible stages of a litigation, preferably on pleading or summary judgment motions."  895 F.2d at 1001 (emphasis added).

Finding that Mayor Fiedler is entitled to qualified immunity on Plaintiff's § 1983 claim, the Court will dismiss

Count I/II.  As the remaining claims against Mayor Fiedler fail to state actionable claims, and as Plaintiff has voluntarily dismissed the claims against the other Defendants, the Complaint will be dismissed in its entirety.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge


DATED:  August 5, 2010.